# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MANE SHAMAN AL-HABARDI,
a/k/ MAZIN SALIH AL-HARBI,
Petitioners/Plaintiff,

v.

GEORGE W.  BUSH, *et. al.,*
Respondents/Defendants.

Civil Action No.
1:05-CV-1857-CKK

## PETITIONER'S REPLY BRIEF ON "MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO" (Dkt. 5)

NOW Comes Petitioner and respectfully replies to

"Respondents' Memorandum In Opposition to Petitioner's Motion for

Preliminary Injunction Requiring Advance Notice of Transfer or Release"

(Dkt. 7, hereafter "Memorandum in Opposition").[1]

---

[1] The Memorandum in Opposition states, at p. 1, that Respondents "do not have a record of a Guantanamo detainee who goes by the name [Mazin Salih Al-Harbi] given for petitioner in the caption." . Petitioner has corrected the caption to indicate the correct spelling of Petitioner's name.

## STATEMENT OF FACTS

Petitioner, a national of Saudi Arabia, is being involuntarily detained by Respondent at Guantanamo. His Petition (Dkt. 1, hereafter "Pet.") alleges that he has never been an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any of respondents' definitions, Pet. para. 10; that he is not a member of the Taliban or al Quaeda, *id.,* para. 11; and that he has been detained at Guantanamo for more than two years in violation of his rights under the Constitution and other laws, *id.,* Para. 12.

Petitioner has further alleged that he has reason to fear transfer to another country for torture or further indefinite detention; that respondent has secretly removed similarly situated detainees to such an end, a process known as "rendition;" and that numerous governmental and national and international news reports detail instances of rendition for torture and indefinite detainment. *See,* "Motion for Order Requiring Respondents to Provide Counsel for Petitioner and the Court with Advance Notice of Any Intended Removal of Petitioner From Guantanamo" (Dkt. 5), at pp. 2-5.[2]

---

[2] Other reputable newspaper articles not cited in the Petition state that U.S. Government officials have acknowledged rendering detainees to countries that practice torture, Dana Priest, Jet is an Open Secret in Terror War, Washington Post, Dec. 27, 2004, at A1; and that the Department of Defense has plans to transfer hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen, Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, New York Times, March 11, 2005, at A1. An article yesterday in the Washington Post, at A1, alleged that the CIA has for several years been operating

There are presently approximately 520 detainees at Guantanamo. Waxman Declaration, Exhibit A to Memorandum in Opposition, at para. 2. A total of 234 detainees have been previously released from Guantanamo, of whom 67 were "transferred to the control of their home governments for further detention, investigation and/or prosecution. *Id.*, para. 4. These 67 transferees include 4 persons transferred to Saudi Arabia. *Id.*

## ARGUMENT

Motions substantially identical to the motion presented here have been considered and decided by several other Judges of this Court. The motion has been granted in full or in substantial part in these rulings:

| Case No. | Petitioner | Date | Judge | Attached hereto as |
|----------|-----------|------|-------|--------------------|
| 04-1254 | Abdah | 3-29-05 | Kennedy | Ex. A (Mem. Op.)<br>Ex. B (Order) |
| 05-520 | Al-Oshan | 3-31-05 | Urbina | Ex. C (Mem. Order) |
| 05-490 | Al-Shihry | 4-1-05 | Friedman | Ex. D (Order) |
| 05-301 | Al-Joudi | 4-4-05 | Kessler | Ex. E (Mem. Op.)<br>Ex. F (Order) |
| 04-2035 | Al-Marri | 4-4-05 | Kessler | Ex. G (Mem. Op.)[3]<br>Ex. H (Order) |

---

prisons for alleged terrorists in various foreign countries under conditions of extreme secrecy.

[3] This Memorandum is in large part identical with *Al-Joudi* (Ex. E), decided the same day by the same Judge.

04-1135    Kurnaz    4-12-05    Huvelle    Ex. J[4]

Petitioner is unaware that a motion substantially similar to the motion now presented has been previously decided by this Court.

Petitioner respectfully refers the Court to the attached Memoranda and Orders for a persuasive demonstration of the merits of the instant motion. These Memoranda and Orders establish the following propositions:

1. To obtain a preliminary injunction petitioner must show irreparable harm, a substantial likelihood of success on the merits, a lack of substantial injury to respondent should the injunction issue, and that an injunction serves the public interest. Ex. A, p. 5; Ex. E, pp. 6-7; Ex. G, p. 7.

2. In applying these four factors, if petitioner shows that denial of the requested injunction would cause him decidedly more hardship than grant of it would cause respondent, then ordinarily the injunction should issue if petitioner has raised serious, substantial, difficult and doubtful questions on the merits. Ex. E, p. 7; Ex. G, pp. 7-8.

3. Petitioner has shown irreparable harm. *First*, he faces a substantial risk of rendition to be tortured, since Guantanamo detainees have admittedly been transferred to countries known to torture prisoners, including Saudi

_____

[4]    Exhibit I (eye) is omitted as a matter of clarity of reference.
        Some Judges of this Court have denied similar motions. These cases are collected at n. 2 of the Memorandum in Opposition.

Arabia. Ex. E, pp. 8-9; *See*, Ex. A, pp. 6-7 (declining to decide the issue).

*Second*, transfer to another country would likely deprive this Court of

jurisdiction over petitioner, thus denying him his right to "test the legitimacy

of his executive detention." *Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.C.D.C.

1998). Ex. A, p. 7; Ex. E, pp. 9-10.

4. Petitioner has shown a substantial likelihood of success on the

merits. The issues presented by this case have resulted already in one

Supreme Court decision, one decision of this Circuit Court of Appeals, and

several conflicting decisions of this Court. Fair grounds for litigation are

thus presented. Ex. E, pp. 11-12. Additionally, *Fed.R.App.P.* 23(a) requires

that permission of the Court be obtained before a habeas prisoner may be

transferred, Ex. A, pp. 8-9, and is of persuasive force here because many of

the issues presented by the instant habeas petition are also concurrently

presented by appeals in similar cases from this Court.

5. There will be small or no injury to respondent if the requested

injunction is granted. Requiring 30 days' notice of intended transfer will not

interfere with Executive authority nor impede the conduct of foreign affairs.

The government need not consult the Court before making any transfer

decision, it need only notify Court and counsel after the decision is taken

and thirty days before it is implemented. Ex. A, pp. 10-11; Ex. E, pp. 13-14.

6. The public interest lies in the adjudication of constitutional rights when, as here, that opportunity can be preserved without harm to respondent and petitioner has not been competently adjudged to be an enemy combatant. Ex. A, pp. 11-12; Ex. E, pp. 14-15.

7. The Court has jurisdiction under the All Writs Act, 28 U.S.C. 1651(a), to preserve its jurisdiction when it is shown that respondent may act to circumvent it. Ex. E, p. 10 n. 10; Ex. J, p. 3; *see*, Ex. C, p. 2 (Court has inherent power to stay proceedings).

## CONCLUSION

Petitioner seeks only a "concrete, narrow, and minimally burdensome remedy." Ex. E, p. 15. It should be granted forthwith.

Respectfully submitted, November 3, 2005.

Jeffrey J. Davis
Moore and Van Allen PLLC
100 North Tryon Street
47th Floor
Charlotte NC 28202-4002
(704) 331-1037
(704) 378-2037 (Fax)
(704) 661-5244 (Cell)
jeffdavis@mvalaw.com
North Carolina Bar No. 6582

_George Daly_

George Daly
139 Altondale Avenue
Charlotte NC 28207
(704) 333-5196
gdaly1@bellsouth.net
North Carolina Bar No. 1071

OF COUNSEL:

Tina Monshipour Foster (TF3555)
Gitanjali Gutierrez (GG1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAHMOAD ABDAH, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action 04-1254 (HHK) |

## MEMORANDUM OPINION

Petitioners are aliens who are being held by the United States military at Guantánamo Bay Naval Base in Cuba and who have petitioned this court for a writ of habeas corpus. While the merits of their individual claims have not yet been adjudicated, this court (Green, J.) has determined that some of the causes of action set forth in their habeas petition survive Respondents' motion to dismiss. This ruling is currently on appeal. Presently before the court is Petitioners' motion for a preliminary injunction. Asserting that Respondents have contemplated or are contemplating transferring them to the custody of foreign nations to be further detained and possibly tortured, Petitioners seek an order from this court that would require Respondents to provide their counsel and this court with 30 days' advance notice of any Petitioner's removal from Guantánamo. Upon consideration of the briefing of the parties, the submissions that accompany the briefing, and the arguments of counsel at a hearing, the court concludes that Petitioners' motion should be granted.

# I. BACKGROUND

Petitioners are thirteen[1] Yemeni nationals who each allegedly traveled to Pakistan for reasons "unrelated to any activities of al Qaeda or the Taliban," Pet. ¶ 19,[2] such as pursuing religious studies, *id*. ¶¶ 26, 40, 43, 45, 47; obtaining medical care, *id*. ¶ 33; and seeking better employment, *id*. ¶ 36. All were "arrested by Pakistani police as part of a dragnet seizure of Yemeni citizens." *Id*. ¶ 19. Details of their capture and subsequent movements are hazy, but Petitioners allege that they were seized in 2001 or 2002, *id*. ¶ 20, "far from the battlefield." *Id*. ¶ 61. All were then transferred to United States military custody and transported to the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo"), where they have since been held, "virtually *incommunicado*," *id*. ¶ 63, as "enemy combatants." All Petitioners deny that they are enemy combatants or that they have otherwise been "part of or supporting forces hostile to the United States." *Id*. ¶ 15.

On June 28, 2004, the Supreme Court determined that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of [the detainees at Guantánamo Bay] who claim to be wholly innocent of wrongdoing." *Rasul v. Bush*,

---

[1] The court notes some inconsistency in the parties' briefing regarding the number of Petitioners included in this action. The petition for writ of habeas corpus lists *fourteen* individuals: (1) Mahmoad Abdah; (2) Majid Mahmoud Ahmed; (3) Abdulmalik Abdulwahab Al-Rahabi; (4) Makhtar Yahia Naji Al-Wrafie; (5) Aref Abd Il Rheem; (6) Yasein Khasem Mohammad Esmail; (7) Adnan Farhan Abdul Latif; (8) Jamal Mar'i; (9) Othman Abdulraheem Mohammad; (10) Adil Saeed El Haj Obaid; (11) Mohamed Mohamed Hassan Odaini; (12) Sadeq Mohammed Said; (13) Farouk Ali Ahmed Saif; and (14) Salman Yahaldi Hsan Mohammed Saud. Pet. ¶¶ 22-51 and caption.

Petitioners' motion for a preliminary injunction identifies *thirteen* Petitioners, Pet'rs' Mot. at 2, while Respondents mention *twelve* detainees, stating they have no records corresponding to Aref Abd Il Rheem. Resp'ts' Opp'n at 2, n.1.

[2] "Pet." refers to Petitioners' petition for writ of habeas corpus filed July 27, 2004.

__ U.S. __, 124 S. Ct. 2686, 2699 (2004). Shortly thereafter, the Department of Defense issued

an order creating the Combatant Status Review Tribunal ("CSRT") to evaluate the status of each

detainee at Guantánamo. *In re Gunatanamo Detainee Cases*, 355 F. Supp. 2d 443, 450 (D.D.C.

2005), *appeal docketed*, No. 05-8003 (D.C. Cir. Mar. 21, 2005). On July 27, 2004, Petitioners

filed a petition for writ of habeas corpus, seeking to obtain "a judicial determination of whether

there is a factual basis for Respondent's determination that they are 'enemy combatants,'" Pet. ¶

14, and asserting that the government has "advanced no justification" for their "arrest,

transportation and continued incarceration." *Id.* ¶ 16. Their petition was coordinated with ten

other habeas cases filed by other Guantánamo detainees to allow Judge Joyce Hens Green, the

designated judge, to resolve common issues of law and fact.

On January 31, 2005, Judge Green issued a memorandum opinion and order granting in

part and denying in part Respondents' motion to dismiss, finding that the detainees "have the

fundamental right to due process of law under the Fifth Amendment," *In re Gunatanamo

Detainee Cases*, 355 F. Supp. 2d at 463, and that the CSRT proceedings failed to protect those

due process rights. *Id.* at 468.

Subsequently, Judge Green issued an order certifying her opinion for interlocutory appeal

and staying the proceedings in the eleven cases pending resolution of Respondents' appeal.

Petitioners now contend that "Respondents have contemplated or are contemplating removal of

some or all Petitioners from Guantánamo to foreign territories for torture or indefinite

imprisonment without due process of law." Pet'rs' Mot. for Prelim. Inj. ("Pet'rs' Mot.") at 1.

Fearing that any such transfer would "also circumvent[] Petitioners' right to adjudicate the

legality of their detention," *id.* at 6, Petitioners seek a preliminary injunction requiring

3

Respondents to provide Petitioners' counsel with 30 days' advance notice of "any intended

removal of Petitioners from Guantanamo Bay Naval Base," *id.* at 1, to enable counsel to contest

the removal if they deem it advisable to do so.

## II. ANALYSIS

**A.    Stay of February 3, 2005**

Respondents first argue that the stay order Judge Green issued in the eleven coordinated

cases prevents this court from considering the merits of the present motion. This argument is

unavailing.

On February 3, 2005, Judge Green issued an order in the eleven habeas cases that "stayed

[the cases] for all purposes pending resolution of all appeals in this matter." *In re Guantanamo*

*Detainee Cases,* No. 04-1254 (D.D.C. Feb. 3, 2005) (order). Courts have consistently

recognized that a stay may be necessary preserve the status quo among the parties pending

appeal. *See, e.g., Warm Springs Dam Task Force v. Gribble,* 417 U.S. 1301, 1310 (1974);

*United Mun. Distrib. Group v. FERC,* 732 F.2d 202, 205 (D.C. Cir. 1984); *NLRB v. Sav-on*

*Drugs, Inc.,* 704 F.2d 1147, 1149 (9th Cir. 1983); *Metzler v. United States,* 832 F. Supp. 204,

208 (E.D. Mich. 1993). Here, Petitioners are not asking the court to bypass the stay and resume

adjudication of their underlying claims. Rather, they seek to prevent Respondents from

unilaterally and silently taking actions that may render their claims moot; thus the injunctive

relief Petitioners seek would ensure the very same result that the stay itself was entered to

secure. *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,*

412 F.2d 165, 169 (D.C. Cir. 1969). The stay order simply cannot be construed to prevent

emergency relief consistent with maintenance of the status quo. *See Summit Med. Assocs., P.C.*

4

*v. James,* 998 F. Supp. 1339, 1351 (M.D. Ala. 1998); *Universal Marine Ins., Ltd. v. Beacon Ins. Co.,* 577 F. Supp. 829, 832 (W.D.N.C. 1984). The court therefore proceeds to consider the merits of Petitioners' request.

**B.    Legal Standard**

A preliminary injunction is an "extraordinary remedy" that should only issue "when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). A court considering a preliminary injunction request must examine four factors, namely whether: (1) Petitioners will be "irreparably harmed if an injunction is not granted"; (2) there is a "substantial likelihood" Petitioners will succeed on the merits; (3) an injunction will "substantially injure" Respondents; and (4) the public interest will be furthered by the injunction. *Serono Labs., Inc., v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). These four factors "interrelate on a sliding scale" and must be considered in relation to one another, for "'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Id.* at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995)).

**C.    Merits of the Preliminary Injunction Motion**

1. Irreparable Injury

The court gives special scrutiny to Petitioners' claims of injury, because "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.,* 58 F.3d at 747 (quoting *Sampson v. Murray,* 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive

relief, Petitioners must show that the injury threatening them is more than "remote and speculative." *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 897 (D.D.C. 1996). Petitioners unquestionably make such a showing.

Petitioners allege two irreparable injuries. With respect to the first, they claim that the Department of Defense is actively planning the transfer of detainees from Guantánamo to countries "for torture or indefinite imprisonment without due process of law," Pet'rs' Mot. at 1, and note that the United States has "repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." *Id.* at 3. Respondents dispute these assertions, dismissing them as "sensationalistic allegations" based upon "hollow speculation" and "largely anonymous sources and innuendo" cited in newspaper and magazine articles, Resp'ts' Opp'n at 19, and statements from a single detainee. Respondents then describe the policy and procedures the United States employs regarding the transfer and repatriation of Guantánamo detainees, including the transfer of detainees to the control of other governments for investigation and possible prosecution. Respondents state that "a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations," Resp'ts' Opp'n at 4, and that "it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured." *Id.* Respondents also provide declarations from high-level Department of State and Department of Defense officials outlining the consultations and deliberations the agencies undertake prior to transferring a detainee, and indicating that among 211 detainees the military has transferred out of Guantánamo to date, 65 were provided to foreign governments for ongoing detention. *Id.*, Prosper Decl. ¶ 2, Waxman Decl. ¶ 4.

6

These declarations concerning general policy and practice, however, do not entirely refute Petitioners' claims or render them frivolous. The court has reviewed Petitioners' exhibits, and notes that in addition to citing anonymous sources, the submitted articles quote by name former Guantánamo detainees, former high-level officials from the United Kingdom and Pakistan, and current and former employees of the United States government who were themselves involved in transferring detainees. The court, however, need not determine whether Petitioners' fear of torture constitutes the requisite "irreparable injury" because their second claim of injury clearly satisfies the preliminary injunction standard.

Petitioners contend that if the United States military transfers Petitioners from Guantánamo to overseas custody, it would effectively extinguish those detainees' habeas claims by fiat. Such transfers would eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their "fundamental right to test the legitimacy of [their] executive detention." *Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.D.C. 1998). The parties agree that upon transfer, the court will no longer retain jurisdiction to provide any relief Petitioners seek. Hr'g Tr. at 19:7-10; Resp'ts' Opp'n at 6 ("once transferred, a detainee is no longer subject to the control of the United States"), Waxman Decl. ¶ 5. While Respondents contest Judge Green's determination that Petitioners have legally cognizable due process claims properly before the court, pending their appeal they may not act to deprive this court of its jurisdiction over the very "corpus" of this case; indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (quoting *Alabama Great S. R. Co. v. Thompson*, 200 U.S. 206, 218 (1906)).

2. Likelihood of Success

Petitioners argue that they have properly invoked this court's jurisdiction and have stated

actionable claims under the Due Process Clause of the Fifth Amendment and the Geneva

Convention, thereby demonstrating a likelihood of success. Respondents urge instead that

Petitioners fail to make the required showing "that they are likely to succeed in establishing a

judicially enforceable entitlement to veto the same repatriation that they previously told the Court

Respondents were required to conduct." [3] Resp'ts' Opp'n at 11 (emphasis omitted). Although

the court would use somewhat different language to characterize the relevant standard,

Respondents are correct that *if* there are no circumstances under which Petitioners could obtain a

court order preventing a contemplated transfer, a preliminary injunction should not be granted.

Respondents are wrong, however, in arguing that there are in fact no such circumstances present,

and that consequently there is no legal basis for judicial involvement in transfer or repatriation

decisions regarding Petitioners.

To the contrary, transfer of Petitioners without notice and leave of court is forbidden by

FED. R. APP. P. 23(a), which requires that "pending review of a decision in a habeas corpus

proceeding[4] commenced before a court . . . the person having custody of the prisoner must not

transfer custody to another unless a transfer is directed in accordance with this rule." The Rule

---

[3] This last contention is perplexing, because it seems beyond question that advocating for release into freedom is not equivalent to advocating for transfer from ongoing detention in one locale to ongoing detention in another.

[4] Jurisdiction over a petition for a writ of habeas corpus is determined when the petition is filed. *Barden v. Keohane*, 921 F.2d 476, 477 n.1 (3d Cir. 1990) (citing accordance with *Ross v. Mebane*, 536 F.2d 1199 (7th Cir. 1976) (per curiam); *Harris v. Ciccone*, 417 F.2d 479 (8th Cir. 1969), *cert. denied*, 397 U.S. 1078 (1970)).

"was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas

corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in

which a habeas petition is pending." *Hammer v. Meachum*, 691 F.2d 958, 961 (10th Cir. 1982)

(citing *Jago v. United States Dist. Court*, 570 F.2d 618, 626 (6th Cir. 1978), and *Goodman v.

Keohane*, 663 F.2d 1044, 1047 (11th Cir. 1981)). Respondents' contention that Rule 23(a) is not

typically applied in situations involving the transfer of prisoners to the custody of foreign nations,

Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 3, while correct, is of no moment. Its

application here is consistent with both the text of the rule and its underlying purpose. Indeed,

Rule 23(a) acquires an even greater importance in the context of Petitioners' case. When a

prisoner with a pending habeas action is simply transferred from one state to another in violation

of Rule 23(a), the transfer "does not divest [the court of its] jurisdiction over the action."

*Reimnitz v. State's Attorney of Cook County*, 761 F.2d 405, 409 (7th Cir. 1985). Here, though,

Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction.

Petitioners thus demonstrate that they have a clear likelihood of success in blocking a transfer

made absent notice to, and approval from, the court.

Respondents further argue against the application of Rule 23(a) by referring to a footnote

in *Rasul*, which remarked that after the Supreme Court granted certiorari, two petitioners in that

case, Shafiq Rasul and Asif Iqbal, were "released from custody." *Rasul*, 124 S. Ct. 2686, 2691

n.1. Respondents argue that this reference demonstrates that the Supreme Court "did not give

any hint of perceiving any violation" of the Supreme Court's equivalent to Rule 23(a). Resp'ts'

Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 4; *see also* Hr'g Tr. at 7:20-21. The court declines

Respondents' invitation to make such an inference, both because there is no indication in *Rasul*

9

whether the two named petitioners were transferred into foreign custody or released outright, and because neither party presented the issue to the Supreme Court.

### 3. Harm to Respondents

Respondents assert that granting Petitioners' motion would "illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." Resp'ts' Opp'n at 1. They also argue that granting Petitioners' injunction request would harm the government in "myriad" other ways, by "undermining the United States Government's ability to investigative and resolve allegations of mistreatment or torture"; "undermin[ing] the United States' ability to reduce the numbers of individuals under U.S. control"; impairing the United States' coordination with other governments' efforts in the war on terrorism; and "encumber[ing] . . . an already elaborate process leading up to transfers or repatriations." Resp'ts' Opp'n at 22. At the preliminary injunction hearing held on March 22, 2005, Respondents' counsel amplified these contentions, noting that the advance notice requirement would "undermine[] the executive's ability to speak with one voice." Hr'g Tr. at 8:10-11. Beyond these vague premonitions, however, the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority. The preliminary injunction Petitioners seek will not require, or even enable, the court to take the two *specific* actions which Respondents' declarants warn against: forcing State Department officials to "unilaterally . . . disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns," Resp'ts' Opp'n, Prosper Decl. ¶ 10, and publicly disclosing the facts gathered and analyses prepared by various State Department offices, or bringing these findings "to the attention of officials and others in

foreign States . . ." *Id.* ¶ 11.

In evaluating the alleged injury Respondents would suffer if the preliminary injunction is granted, the court balances the respective hardships imposed upon the parties. *See O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *George Washington Univ. v. District of Columbia*, 148 F. Supp. 2d 15, 18-19 (D.D.C. 2001). While the injunction Petitioners seek might restrict or delay Respondents with respect to one aspect of managing Petitioners' detention, such a consequence does not outweigh the imminent threat facing Petitioners with respect to the *entirety* of their claims before the court.[5]

4. Public Interest

Finally, the court looks to whether granting the preliminary injunction request implicates the public interest, and if so, whether it confers benefit or produces harm. Respondents simply conflate the public interest with their own position, noting that "the public interest and harm-to-non-movant factors converge." Resp'ts' Opp'n at 21. It is indisputable that the public interest favors vigorously pursuing terrorists and holding them to account for their actions. It is

---

[5] Respondents' assertion that they are merely "relinquishing" custody of detainees whom the government is simply "no longer interested in detaining," Hr'g Tr. at 9:20-21, is disingenuous. According to Petitioners' allegations, unanswered by the United States, they have been held at Guantánamo for periods of several years, *see, e.g.*, Pet'rs' Mot., Exs. K, M, O, S. The government's invocation of sudden exigency requiring their transfer now cannot trump Petitioners' established due process rights to pursue their habeas action in federal court. *See Rasul*, 124 S. Ct. at 2698-99; *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 464 ("Of course, it would be far easier for the government to prosecute the war on terrorism if it could imprison all suspected 'enemy combatants' at Guantanamo Bay without having to acknowledge and respect any constitutional rights of detainees. That, however, is not the relevant legal test . . . . constitutional limitations often, if not always, burden the abilities of government officials to serve their constituencies.").

misleading, however, to frame the relevant interest here as the government's ability "to detain

enemy combatants to prevent them from returning to the fight and continuing to wage war against

the United States." Resp'ts' Opp'n at 21-22. Petitioners' current designation as enemy

combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the

government's determination that Petitioners have engaged in hostilities against the United States,

or aided those who have, are the very core of Petitioners' underlying habeas claims.

Respondents' assertion to the contrary, that "Petitioners' enemy combatant status was recently

confirmed in Combatant Status Review Tribunals," Resp'ts' Opp'n at 2, ignores Judge Green's

ruling that the CSRTs as so far implemented are constitutionally deficient. Instead, this factor

tilts in Petitioners' favor, because the public has a strong interest in ensuring that its laws do not

subject individuals to indefinite detention without due process; "[i]t is always in the public

interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich.*

*Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

**D.    All Writs Act**

Petitioners also ask the court to exercise its authority under the All Writs Act, which

provides in relevant part that "all courts established by Act of Congress may issue all writs

necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

principles of law." 28 U.S.C. § 1651(a). The All Writs Act "empowers a district court to issue

injunctions to protect its jurisdiction . . . ," *SEC v. Vision Communications, Inc.*, 74 F.3d 287,

291 (D.C. Cir. 1996), and a court may grant a writ under the Act whenever it determines such

action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S.

269, 273 (1942). Were the court to find adequate "alternative remedies" unavailable, *Clinton v.*

*Goldsmith*, 526 U.S. 529, 537 (1999), or "the traditional requirements of an injunction"

inapplicable, *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1101 n.13 (11th Cir. 2004), it

could employ the Act to order the relief Petitioners seek. Because Petitioners have made a clear

showing that a preliminary injunction is warranted under the familiar four-part test, though, the

court need not take recourse to the All Writs Act.

## III. CONCLUSION

For the foregoing reasons, the court finds that Petitioners satisfy the requirements for a

preliminary injunction, and therefore grants their present motion. An appropriate order

accompanies this memorandum opinion.


Henry H. Kennedy, Jr.
United States District Judge


Dated: March 29, 2005

13

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHMOAD ABDAH, et al.,**<br><br>**Petitioners,**<br><br>v.<br><br>**GEORGE W. BUSH, et al.,**<br><br>**Respondents.** | **Civil Action 04-1254 (HHK)** |

## ORDER

For the reasons stated in the court's memorandum docketed this same day, it is this 29th day of March, 2005, hereby

**ORDERED,** that Petitioners' motion for a preliminary injunction is **GRANTED**; and it is further

**ORDERED,** that Respondents shall provide Petitioners' counsel and the court with 30 days' notice prior to transporting or removing any of Petitioners from Guantánamo Bay Naval Base; and it is further

**ORDERED,** that this order shall remain in effect until the final resolution of Petitioners' habeas claims unless otherwise modified or dissolved.

Henry H. Kennedy, Jr.
United States District Judge

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALEH ABDULLA AL-OSHAN *et al.*,                    :
                                                    :
                    Petitioners/                    :
                    Plaintiffs,                     :
                                                    :
            v.                                      :        Civil Action No.:    05-0520 (RMU)
                                                    :
GEORGE W. BUSH *et al.*,                            :        Document Nos.:       3, 11
                                                    :
                    Respondents/                    :
                    Defendants                      :

## MEMORANDUM ORDER

### GRANTING MOTION FOR STAY;
### ORDERING 30 DAYS' NOTICE OF ANY INTENT TO MOVE PETITIONERS;
### DENYING WITHOUT PREJUDICE MOTION FOR PRELIMINARY INJUNCTION AS MOOT

This matter comes before the court on the respondents' motion to stay proceedings

pending related appeals and for continued coordination.  On January 19, 2005, Judge Leon issued

opinions in *Khalid v. Bush* and *Boumediene v. Bush* granting the government's motion to dismiss

petitions for writ of habeas corpus brought by detainees at the United States Naval Station at

Guantanamo Bay, Cuba ("GTMO").  *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005).  On

January 31, 2005, Judge Green issued an opinion in *In re Guantanamo Cases*, granting in part

and denying in part the government's motion to dismiss in eleven cases consolidated for the

purpose of that motion.  *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005).

The petitioners in the above cases filed notices of appeal, and the D.C. Circuit has yet to issue an

opinion.  Accordingly, the state of the law in this circuit concerning the habeas rights of GTMO

detainees is unclear.

1

In its motion to stay, the government points to the inefficiency of resolving the merits of the instant habeas petition prior to the D.C. Circuit issuing a ruling that will cover similar matters. Respondents' Mot. to Stay at 1-2. The government states that during the pendency of the stay the government will not "block counsel access to properly represented petitioners. To that end, respondents do not object to entry in these cases of the protective order previously entered in other Guantanamo detainee cases, along with appropriate supplementary orders, to permit such access." *Id.* at 2.

The court is well aware of the petitioners' concern that the government may remove the petitioners from GTMO in the near future, thereby divesting (either as a matter of law or *de facto*) the court of jurisdiction. Such an outcome would abuse the processes now put in place for the purpose of adjudicating matters on their merits. *See Rasul v. Bush*, 124 S.Ct. 2686 (2004). Accordingly, the court cannot allow such a scenario to unfold; the court will "guard against depriving the processes of justice of their suppleness of adaptation to varying conditions." *Landis v. North American Co.*, 299 U.S. 248, 256 (1936). Coextensive with the district court's inherent power to stay proceedings is the court's power to craft a stay that balances the hardships to the parties. *Id.* at 255 (noting concerns regarding the stay causing "even a fair possibility . . . [of] damage to some one else"); *see also Clinton v. Jones*, 520 U.S. 681, 707 (1997) (noting that "burdens [to the parties] are appropriate matters for the District Court to evaluate in its management of the case").

2

Accordingly, it is this 31st day of March, 2005,

**ORDERED** that the respondents' motion for stay is **GRANTED**; and it is

**FURTHER ORDERED** that the respondents, their agents, servants, employees,

confederates, and any persons acting in concert or participation with them, or having actual or

implicit knowledge of this Order by personal service or otherwise, may not remove the

petitioners from GTMO unless this court and counsel for petitioners receive thirty days' advance

notice of such removal; and it is

**FURTHER ORDERED** that the court **ENTERS** by way of reference the protective

ordered previously entered in the other Guantanamo detainee cases. *E.g.*, Amended Protective

Order and Procedures for Counsel Access to Detainees at the United States Naval Base in

Guantanamo Bay, Cuba, *In re Guantanamo Detainee Cases*, No. 02-0299 (D.D.C. Oct. 8, 2004);

and it is

**FURTHER ORDERED** that, in light of this order, the petitioners' motion for

preliminary injunction is denied without prejudice as moot.

**SO ORDERED**.



RICARDO M. URBINA
United States District Judge

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ADBUL-SALAM GAITHAN MUREEF AL-SHIRY, et al., | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 05-0490 (PLF) |
| GEORGE W. BUSH, et al., | ) ) ) | |
| Respondents. | ) ) ) | |

ORDER

   This matter is before the Court on petitioner's motion for a preliminary injunction enjoining respondents from removing him from the Guantanamo Bay Naval Base and rendering him to the custody of a foreign country without 30 days' advance notice to petitioner's counsel and leave of court.  Upon consideration of the arguments of the parties, and in view of the Opinion and Order issued by Judge Henry Kennedy in Abdah v. Bush, Civil No. 04-1254 (D.D.C. Mar. 29, 2005), granting a substantially identical motion for preliminary injunction filed by petitioners in that case and the Memorandum Order issued by Judge Urbina in Al-Oshan, et al. v. Bush, Civil No. 05-0520 (D.D.C. Mar. 31, 2005), ordering the government to give petitioners' counsel 30 days' advance notice before removing petitioners from Guantanamo Bay, it is hereby

   ORDERED that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, may not remove petitioner from the Guantanamo Bay Naval Base unless this court and counsel for petitioners receive thirty days'

advance notice of such removal; and it is

FURTHER ORDERED that in light of this order, [5] petitioners' motion for

preliminary injunction is DENIED as moot.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: April 1, 2005

2

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
MAJID ABDULLA AL-JOUDI,        :
et al.,                        :
                               :
        Petitioners,           :
                               :
        v.                     :       Civil Action No. 05-301  (GK)
                               :
GEORGE W. BUSH, et al.,        :
                               :
        Respondents.           :
                               :
```

MEMORANDUM OPINION

Petitioners, four Saudi Arabian nationals, bring this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where they are being detained.[1] This matter is before the Court on Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioners' Motion is **granted.**

---

[1] Petitioners are Majid Abdulla Al-Joudi, Yousif Mohammad Mubarak Al-Shehry, Abdul-Hakim Abdul-Raman Al-Moosa, and Abdulla Mohammaed Al-Ghanmi.  There are four other Petitioners, who are Next Friends of the detainees.  The Next Friends obviously are not subject to transfer from Guantanamo.  All references herein will be to the Petitioners who actually are being detained.

## I.    BACKGROUND

### A.    Procedural History

Petitioners are being detained at GTMO and have been classified as enemy combatants.[2]  On February 9, 2005, they filed a Petition for Writ of Habeas Corpus in this Court.  They are among many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."  Rasul v. Bush, 124 S. Ct. 2686, 2699 (2004).

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005). On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven cases consolidated pursuant to the September 15, 2004, Resolution of the Executive Session.  In re Guantanamo Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).[3]  The cases before Judges Leon and Green have been fully

---

[2]  Petitioners' counsel has not yet been able to meet with her clients and therefore has very limited knowledge of Petitioners' precise circumstances.  Upon receiving the proper security clearances, which counsel hopes to obtain in the near future, she will travel to Cuba to meet with her client.  Transcript of Motions Hearing ("Tr.") at 15 (March 30, 2005).

[3]  Judge Green's Memorandum Opinion and Order did not apply to the instant case, which was filed after the release of her Opinion.

briefed in the United States Court of Appeals for the District of Columbia and are under submission.

On February 3, 2005, Judge Green granted a stay in the eleven cases to which her January 31, 2005, Opinion and Order applied. A Motion to Stay the instant case until resolution of Khalid and In Re Guantanamo Cases is pending in this Court.

### B.    Transfers from GTMO

Approximately 540 foreign nationals currently are being held at GTMO. Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration").[4] The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted. Id. at ¶ 3. Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries. Id. at ¶ 4.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. Id. at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

---

[4] Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs. Id. at ¶ 1.

Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. Id. at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. Id.

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. Id..

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). Id. ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." Id..

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper

4

Declaration")[5]; political or legal developments in the country that would provide context for the assurances, id.; and U.S. relations with the country. Id. Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Some, for example, quote former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. See, e.g., Dana Priest, Jet Is an Open Secret in Terror War, Wash. Post, Dec. 27, 2004, at A1. In addition, some quote by name former Guantanamo detainees who allege that they have been moved by the United States government to countries where they have been tortured. See, e.g. Douglas Jehl and David Johnson, Rule Change Lets C.I.A. Freely Send Suspects Abroad, N.Y. Times, Mar. 6, 2005, at A1.

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen." Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, N.Y. Times, Mar. 11, 2005, at A1.

---

[5] Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. Id. at ¶ 1.

In response to this article, several petitioners, including the Petitioners in the instant case, filed motions for temporary restraining orders and preliminary injunctions.  On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in <u>Abdah v. Bush</u>, No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting temporary restraining order) and denied a similar request in <u>John Does 1-570 v. Bush</u>, No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in <u>Abdah</u>.

After the Motion was filed in the instant case, the Government represented to this Court that none of the parties were scheduled for transfer within the next several weeks.  In addition, counsel for all parties agreed to a combined hearing on the request for a temporary restraining order and the request for a preliminary injunction.  On March 17, 2005, based on those representations, the Court scheduled the hearing on the Motion for March 30, 2005.

## II.  STANDARD OF REVIEW

In considering Petitioners' request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioners would suffer irreparable injury if an injunction were not granted; (2) whether Petitioners have a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest.  <u>Al-Fayed</u>

v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001).[6] "These factors interrelate on a sliding scale and must be balanced against each other." Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Id. at 844.

---

[6] The same factors apply when considering a request for a temporary restraining order. Al-Fayed, 254 F.3d at 303, n.2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to their Motion for Temporary Restraining Order.

## III. ANALYSIS

### A.    Harm to Petitioners

Petitioners argue that they will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioners, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release.[7]

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." CityFed Fin. Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the threatened injury is not merely "remote and speculative." Milk Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996).

In this case, there are two obvious and substantial threats to Petitioners. First, they face the possibility of transfer to a country where they might be tortured or indefinitely confined,

---

[7] The Government also argues that transferring Petitioners from United States custody provides them with the very relief they seek. Tr. at 40. That argument is overly simplistic, however. Petitioners ultimately seek total freedom from all custody, not just United States custody. They can only obtain such relief in this litigation if the Court determines that their underlying detention was unconstitutional or illegal. Furthermore, a determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention. Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

which undeniably would constitute irreparable harm.  While the
Government presents declarations that attempt to mitigate these
concerns, they neither refute Petitioners' claims nor render them
frivolous.[8]   Indeed, the Government admits that 65 of the 211
detainees transferred to date have been transferred for detention,
not release.  Several of the 65 have been transferred to countries
that our own State Department has acknowledged torture prisoners,
including Pakistan, Saudi Arabia, and Morocco.  See Country Reports
on  Human  Rights  Practices  --  2004,  available  at
http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government
was unable to provide any details about the type or form of
"assurances" given, the scope of the monitoring that takes place
after transfer, or the consequences of noncompliance.[9]  Tr. at 32-
33.  In short, the threatened injury is not merely remote and
speculative; it is a serious potential threat.

     Second, Petitioners face the threat of irreparable harm based
on the potential elimination of their habeas claims.  It is unclear
at this point whether transferring Petitioners would strip this
Court of jurisdiction.  See Abdah v. Bush, No. 04-CV-1254, Slip op.
at 7 (D.D.C. March 29, 2005) (transfer to another country "would
effectively extinguish [Petitioners'] habeas claims by fiat"); but

_____

     [8] The Court notes that the Government's affidavits do not
address the Central Intelligence Agency's involvement in any
transfer or "rendition" programs.

     [9] Notably, the Government was also unaware of several other
important facts, such as the availability of extradition treaties
with Qatar or Saudi Arabia, or the consequences if a detainee's
home country refuses to accept him.

see <u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)
(holding that an individual detained in Saudi Arabia could survive
a motion to dismiss his habeas claim based on the theory of
constructive custody).    However, given the danger that, upon
transfer, the Court could lose jurisdiction to adjudicate
Petitioners' claims, it follows that such a transfer could obviate
Petitioners' right to "test the legitimacy of [their] executive
detention."    <u>Lee v. Reno</u>, 15 F. Supp. 2d 26, 32 (D.D.C. 1998).
Since such a turn of events would certainly constitute a threat of
irreparable harm, an order preserving the status quo in this case
is appropriate.[10]

Both threats are imminent.    While the Court certainly has
relied upon the Government's representations that Petitioners will
not be transferred in the next several weeks, the Government is
clearly maintaining its right to transfer them at any time after
the Court rules upon the instant Motion.    Thus, the threats are not
distant or speculative, and transfer could occur in the near
future.

---

[10] The Court has the authority to issue such an injunction
pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers
a district court to issue injunctions to protect its jurisdiction."
<u>SEC v. Vison Communications, Inc.</u>, 74 F.3d 287, 291 (D.C. Cir.
1996); <u>see also</u> <u>Abdah v. Bush</u>, No. 04-CV-1254, slip op. at 7 (March
12, 2004); <u>Abu Ali</u>, 350 F. Supp. 2d at 54 (quoting <u>Alabama Great S.</u>
<u>R. Co. v. Thompson</u>, 200 U.S. 206, 218 (1906)) ("It is well-
established that 'the federal courts may and should take such
action as will defeat attempts to wrongfully deprive parties
entitled to sue in the Federal courts for the protection of their
rights in those tribunals.'").

**B.    Likelihood of Success on the Merits**

Petitioners contend that, given Judge Green's Opinion in <u>In re Guantanamo Cases</u>, they have a substantial likelihood of success on the merits of their habeas claim.  The Government responds that Petitioners' claim would be barred because the treaties under which they seek review are non-self-executing, and because the review sought would encroach upon the foreign policy authority of the executive.

To justify granting a preliminary injunction, Petitioners need not show "a mathematical probability of success."  <u>Washington Metro. Area Transit Comm'n</u>, 559 F.2d at 844.  Rather, "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  <u>Id.</u> (quoting <u>Hamilton Watch Co.</u>, 206 F.2d at 740).

The exact chances of success in this case are extremely difficult to assess.  It is clear, however, that, at a minimum, Petitioners have raised "fair ground[s] for litigation." <u>Washington Metro. Area Transit Comm'n</u>, 559 F.2d at 844.  The issues raised in these motions are sensitive and involve complex constitutional questions.  Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions.  Like the issues in <u>Hamdi v. Rumsfeld</u>, <u>Padilla v. Rumsfeld</u>, and <u>Rasul</u>, there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. See Khalid, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have no constitutional rights); but see In re Guantanamo Cases, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have some constitutional rights). There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioners are transferred to another country.[11]  See Abdah v. Bush, No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); but see Abu Ali v. Ashcroft, 350 F. Supp. 2d at 54. And, there is disagreement about whether the Geneva Conventions are self-executing. See Hamdan v. Rumsfeld, 344 F. Supp. 2d 152, 164 (D.D.C. 2004).

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, substantial, difficult, and doubtful," as to make them a "fair ground for litigation."      Washington Metro. Area Transit Comm'n, 559 F.2d at 844.

---

[11]  The Government also argues that the Supreme Court in Rasul failed to protect its jurisdiction over detainees that were transferred. Rasul, 124 S.Ct. at 2690 n.1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the Rasul petitioners were released to the United Kingdom, not a country known to torture its prisoners. See Country Reports on Human Rights Practices: United Kingdom, available at http://wwws.state.gov/g/drl/rls/hrrpt/2004/41716.htm. ("[t]he [British] Government generally respected the human rights of its citizens").

**C.   Harm to Government**

Petitioners argue that there is absolutely no harm to the Government if it is required to provide the Court and Petitioners' counsel with 30 days' notice before transferring them to another country.   The Government contends, however, that there is great potential harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of GTMO detainees, because such negotiations are often conducted in secret and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction.   Petitioners request only 30 days' notice of transfer -- a narrow and discrete request that would impose no burden on the Government.   Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority.   Abdah, slip op. at 10 (D.D.C. March 29, 2005).   For example, granting Petitioners' request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice.[12]

---

[12] Such issues could arise if Petitioners ultimately are scheduled for transfer and actually request additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioners. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court.

### D.    Public Interest

Petitioners argue that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," Abdah, 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated

14

in an appropriate manner. <u>G & V Lounge, Inc. v. Mich. Liquor
Control Comm'n</u>, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[i]t is always
in the public interest to protect the violation of a party's
constitutional rights"). Retaining jurisdiction over this case is
essential to protecting that public interest. Thus, the public
interest clearly favors entering the preliminary injunction sought
by Petitioners.

**V.    CONCLUSION**

Petitioners have requested 30 days' notice of any transfer
from GTMO, a concrete, narrow, and minimally burdensome remedy.
Based on the Court's analysis of the four relevant factors set
forth in the applicable caselaw, it is clear that Petitioners have
satisfied their burden. They are faced with an imminent threat of
serious harm, which far outweighs any conceivable burden that the
Government might face. Furthermore, while it is not possible to
demonstrate a "mathematical probability of success," the questions
are "serious, substantial, difficult and doubtful." <u>Washington
Metro. Area Transit Comm'n</u>, 559 F.2d at 844. Certainly, the
Government cannot argue that its success on the merits is a
foregone conclusion. Finally, the public interest in granting
Petitioners the requested relief is strong. Therefore, for the
foregoing reasons, Petitioners' Motion for a Temporary Restraining
Order and Preliminary Injunction Requiring Respondents to Provide
Counsel for Petitioners and the Court with 30-Days' Advance Notice
of Any Intended Removal from Guantanamo is **granted.**

An Order will issue with this Opinion.


_____                  ___/s/_____
April 4, 2005                             Gladys Kessler
                                          United States District Judge


**Copies to**:  **Attorneys of Record via ECF**

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAJID ABDULLA AL-JOUDI,      :
et al.,                      :
                             :
        Petitioners,         :
                             :
        v.                   :    Civil Action No. 05-301 (GK)
                             :
GEORGE W. BUSH, et al.,      :
                             :
        Respondents.         :
                             :

ORDER

For the reasons stated in the Court's accompanying memorandum, docketed this same day, it is this 4th day of April, hereby

**ORDERED** that Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo is **granted**; it is further

**ORDERED** that the Government shall provide Petitioners' counsel and the Court with 30 days' notice prior to transporting or removing any of Petitioners from Guantanamo Bay Naval Base; it is further

**ORDERED** that this Order shall remain in effect until the final resolution of Petitioners' habeas claim unless otherwise modified or dissolved; it is further

April 4, 2005

_/s/_____
Gladys Kessler
United States District Judge

**Copies to**: **Attorneys of Record via ECF**

2

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JARALLAH AL-MARRI, et al.,          :
                                    :
        Petitioners,                :
                                    :
    v.                              :    Civil Action No. 04-2035 (GK)
                                    :
GEORGE W. BUSH, et al.,             :
                                    :
        Respondents.                :
                                    :

---

### MEMORANDUM OPINION

Petitioner, Jarallah Al-Marri, brings this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where he is being detained.[1]  This matter is before the Court on Petitioner's Motion for a Preliminary Injunction and Motion for a Temporary Restraining Order, in which he seeks 30 days' notice before any transfer from GTMO.  Upon consideration of the Motions, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioner's Motion for a Preliminary Injunction is **granted**, and Petitioner's Motion for a Temporary Restraining Order is **denied as moot**.

---

[1] Technically, there are two Petitioners in this case, one of whom is Jarallah Al-Marri's Next Friend, who obviously is not subject to transfer from Guantanamo.  All references herein will be to the one Petitioner.

## I.    BACKGROUND

### A.    Procedural History

Petitioner, a citizen of Qatar, has been detained at GTMO for more than three years.[2]  On November 10, 2004, he filed a Petition for Writ of Habeas Corpus.  He is one of many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." Rasul v. Bush, 124 S. Ct. 2686, 2699 (2004).

On November 30, 2004, the Court transferred this case to Judge Joyce Hens Green for coordination and management, as reflected in the September 15, 2004, Resolution of the Executive Session.  On December 28, 2004, Respondents filed a Motion to Dismiss, which became ripe on January 21, 2005.

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005). On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven consolidated cases.

---

[2]    Petitioner's counsel has very limited knowledge of Petitioner's precise circumstances.  Counsel has met with Petitioner, but only very briefly and before actual representation began, when counsel was visiting other clients at GTMO.  Transcript of Motions Hearing ("Tr.") at 12 (March 30, 2005).  Counsel is scheduled to meet with his client in the very near future.  Id.

In re Guantanamo Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).[3]  The
cases before Judges Leon and Green have been fully briefed in the
United States Court of Appeals for the District of Columbia and are
under submission.

_____On February 3, 2005, Judge Green granted a stay in the eleven
cases to which her January 31, 2005, Opinion and Order applied.  On
March 8, 2005, this Court stayed the instant case until the Court
of Appeals resolves the appeals in Khalid and In Re Guantanamo
Cases.[4]

   **B.    Transfers from GTMO**

   Approximately 540 foreign nationals currently are being held
at GTMO.  Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration").[5]
The Department of Defense ("DOD") states it is conducting a review
of each detainee's case, at least annually, to determine whether
continued detention is warranted.  Id. at ¶ 3.  Since the
Government began detaining individuals at GTMO, the DOD has
transferred 211 detainees to other countries.  Id. at ¶ 4.

_____

   [3] Judge Green's Memorandum Opinion and Order did not apply to
eight consolidated cases, including the instant case.  In re
Guantanamo Cases, 355 F. Supp. 2d at 452 n.15.

   [4] The stay issued in this case does not preclude the Court
from considering the merits of the instant Motion.  The stay was
entered to preserve the status quo until resolution of issues on
appeal in similar cases.  The instant Motion does not require the
Court to lift the stay or to adjudicate the case on the merits;
rather, it seeks emergency relief to prevent Petitioner's habeas
claims from being extinguished and to preserve the status quo.
Abdah v. Bush, No. 04-CV-1254, slip op. at 4 (D.D.C. March 29,
2005).

   [5] Waxman is the Deputy Assistant Secretary of Defense for
Detainee Affairs.  Id. at ¶ 1.

3

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system.  Id. at 24.  In each case, the United States loses all control of the detainees once they are transferred to another country.  Waxman Decl. at ¶ 5.

Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. Id. at ¶ 7.  The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers.  Id.

Sixty-five detainees have been transferred to the control of other countries for detention.  Waxman Decl. at ¶ 7.  Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden.  Id..

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS").  Id. ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured."  Id..

4

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper Declaration")[6]; political or legal developments in the country that would provide context for the assurances, id.; and U.S. relations with the country. Id. Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Petitioner has submitted as exhibits articles quoting current and former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. See, e.g., Petr.'s Ex. E (Dana Priest, Jet Is an Open Secret in Terror War, Wash. Post, Dec. 27, 2004, at A1). In addition, Petitioner has submitted articles quoting by name former Guantanamo detainees who allege that they

---

[6] Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. Id. at ¶ 1.

5

have been moved by the United States government to countries where they have been tortured.  See, e.g. Petr.'s Ex. B (Douglas Jehl and David Johnson, Rule Change Lets C.I.A. Freely Send Suspects Abroad, N.Y. Times, Mar. 6, 2005, at A1).

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen."  Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, N.Y. Times, Mar. 11, 2005, at A1.

In response to this article, several petitioners, including the Petitioner in the instant case, filed motions for temporary restraining orders and preliminary injunctions.  On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in Abdah v. Bush, No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting temporary restraining order) and denied a similar request in John Does 1-570 v. Bush, No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in Abdah.

After the Motions were filed in the instant case, the Government represented to this Court that Petitioner was not scheduled for transfer within the next several weeks.  In addition, counsel agreed to a combined hearing on the Motion for Temporary Restraining Order and Motion for Preliminary Injunction.  On March 17, 2005, based on those representations, the Court scheduled the hearing on both Motions for March 30, 2005.

## II.    STANDARD OF REVIEW

In considering Petitioner's request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioner would suffer irreparable injury if an injunction were not granted; (2) whether Petitioner has a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001).[7] "These factors interrelate on a sliding scale and must be balanced against each other." Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d

---

[7] The same factors apply when considering a request for a temporary restraining order. Al-Fayed, 254 F.3d at 303, n.2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to his Motion for Temporary Restraining Order.

738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Id. at 844.

## III. ANALYSIS

### A.   Harm to Petitioner

Petitioner argues that he will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioner, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release.[8]

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." CityFed Fin. Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive relief, Petitioner must show that

---

[8] The Government also argues that transferring Petitioner from United States custody provides him with the very relief he seeks. Tr. at 40.  That argument is overly simplistic, however. Petitioner ultimately seeks total freedom from all custody, not just United States custody. He can only obtain such relief in this litigation if the Court determines that his underlying detention was unconstitutional or illegal.  Furthermore, a determination by a United States court that Petitioner is not an enemy combatant might carry significant weight in his home country, thereby facilitating release from custody if he was transferred for continued detention.  Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

the threatened injury is not merely "remote and speculative." Milk
Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996).

In this case, there are two obvious and substantial threats to
Petitioner.   First, he faces the possibility of transfer to a
country where he might be tortured or indefinitely confined, which
undeniably would constitute irreparable harm.  While the Government
presents declarations that attempt to mitigate these concerns, they
neither refute Petitioner's claims nor render them frivolous.[9]
Indeed, the Government admits that 65 of the 211 detainees
transferred to date have been transferred for detention, not
release.  Several of the 65 have been transferred to countries that
our own State Department has acknowledged torture prisoners,
including Pakistan, Saudi Arabia, and Morocco. See Country Reports
on   Human   Rights   Practices   --   2004,   available   at
http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government
was unable to provide any details about the type or form of
"assurances" given, the scope of the monitoring that takes place
after transfer, or the consequences of noncompliance.[10]  Tr. at 32-
33.   In short, the threatened injury is not merely remote and
speculative; it is a serious potential threat.

---

[9] The Court notes that the Government's affidavits do not
address the Central Intelligence Agency's involvement in any
transfer or "rendition" programs.

[10] Notably, the Government was also unaware of several other
important facts, such as the availability of extradition treaties
with Qatar or Saudi Arabia, or the consequences if a detainee's
home country refuses to accept him.

Second, Petitioner faces the threat of irreparable harm based
on the potential elimination of his habeas claims. It is unclear
at this point whether transferring Petitioner would strip this
Court of jurisdiction. See Abdah v. Bush, No. 04-CV-1254, Slip op.
at 7 (D.D.C. March 29, 2005) (transfer to another country "would
effectively extinguish [Petitioner's] habeas claim[] by fiat"); but
see Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)
(holding that an individual detained in Saudi Arabia could survive
a motion to dismiss his habeas claim based on the theory of
constructive custody). However, given the danger that, upon
transfer, the Court could lose jurisdiction to adjudicate
Petitioner's claims, it follows that such a transfer could obviate
Petitioner's right to "test the legitimacy of [his] executive
detention." Lee v. Reno, 15 F. Supp. 2d 26, 32 (D.D.C. 1998).
Since such a turn of events would certainly constitute a threat of
irreparable harm, an order preserving the status quo in this case
is appropriate.[11]

Both threats are imminent. While the Court certainly has
relied upon the Government's representations that Petitioner will

---

[11] The Court has the authority to issue such an injunction
pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers
a district court to issue injunctions to protect its jurisdiction."
SEC v. Vison Communications, Inc., 74 F.3d 287, 291 (D.C. Cir.
1996); see also Abdah v. Bush, No. 04-CV-1254, slip op. at 7 (March
12, 2004); Abu Ali, 350 F. Supp. 2d at 54 (quoting Alabama Great S.
R. Co. v. Thompson, 200 U.S. 206, 218 (1906)) ("It is well-
established that 'the federal courts may and should take such
action as will defeat attempts to wrongfully deprive parties
entitled to sue in the Federal courts for the protection of their
rights in those tribunals.'").

not be transferred in the next several weeks, the Government is
clearly maintaining its right to transfer him at any time after the
Court rules upon the instant Motion.    Thus, the threats are not
distant or speculative, and transfer could occur in the near
future.

### B.    Likelihood of Success on the Merits

Petitioner contends that, given Judge Green's Opinion in In re
Guantanamo Cases, he has a substantial likelihood of success on the
merits of his habeas claim.    The Government responds that
Petitioner's claim would be barred because the treaties under which
he seeks review are non-self-executing, and because the review
sought would encroach upon the foreign policy authority of the
executive.

To justify granting a preliminary injunction, Petitioner need
not show "a mathematical probability of success."    Washington
Metro. Area Transit Comm'n, 559 F.2d at 844.    Rather, "it will
ordinarily be enough" that the questions raised are so "serious,
substantial, difficult and doubtful, as to make them a fair ground
for litigation."    Id. (quoting Hamilton Watch Co., 206 F.2d at
740).

The exact chances of success in this case are extremely
difficult to assess.    It is clear, however, that, at a minimum,
Petitioner has raised "fair ground[s] for litigation."    Washington
Metro. Area Transit Comm'n, 559 F.2d at 844.    The issues raised in
these motions are sensitive and involve complex constitutional
questions.    Indeed, there are areas of disagreement even among the

11

judges on this Bench about the legal issues raised in these Petitions.   Like the issues in <u>Hamdi v. Rumsfeld</u>, <u>Padilla v. Rumsfeld</u>, and <u>Rasul</u>, there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. <u>See</u> <u>Khalid</u>, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have no constitutional rights); <u>but see</u> <u>In re Guantanamo Cases</u>, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have some constitutional rights).   There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioner is transferred to another country.[12]   <u>See</u> <u>Abdah v. Bush</u>, No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); <u>but see</u> <u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d at 54.   And, there is disagreement about whether the Geneva Conventions are self-executing. <u>See</u> <u>Hamdan v. Rumsfeld</u>, 344 F. Supp. 2d 152, 164 (D.D.C. 2004).

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, substantial, difficult, and doubtful,"

---

[12]   The Government also argues that the Supreme Court in <u>Rasul</u> failed to protect its jurisdiction over detainees that were transferred. <u>Rasul</u>, 124 S.Ct. at 2690 n.1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the <u>Rasul</u> petitioners were released to the United Kingdom, not a country known to torture its prisoners. <u>See</u> <u>Country Reports on Human Rights Practices: United Kingdom</u>, available at http://www.state.gov/g/drl/rls/hrrpt/2004/41716.htm   ("[t]he [British] Government generally respected the human rights of its citizens").

as to make them a "fair ground for litigation."    <u>Washington</u>
<u>Metro. Area Transit Comm'n</u>, 559 F.2d at 844.

### C.    Harm to Government

Petitioner argues that there is absolutely no harm to the
Government if it is required to provide the Court and Petitioner's
counsel with 30 days' notice before transferring him to another
country.  The Government contends, however, that there is great
potential harm to its ability to conduct negotiations with foreign
governments regarding the transfer and subsequent release of GTMO
detainees, because such negotiations are often conducted in secret
and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the
Government would suffer from granting the requested preliminary
injunction.  Petitioner requests only 30 days' notice of transfer
-- a narrow and discrete request that would impose no burden on the
Government.  Beyond "vague premonitions" that such relief would
harm the executive's ability to conduct foreign policy, there is no
concrete evidence that such notice actually will intrude upon
executive authority.  <u>Abdah</u>, slip op. at 10 (D.D.C. March 29,
2005).  For example, granting Petitioner's request for 30 days'
notice of transfer would not require the Court to second-guess
foreign policy decisions of the executive, would not require the
Government to divulge information relating to its negotiations with

foreign governments, and would not prevent the Government from speaking with one voice.[13]

In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioner. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioner's claims before this Court.

### D.    Public Interest

Petitioner argues that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," Abdah, 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United

---

[13] Such issues could arise if Petitioner ultimately is scheduled for transfer and actually requests additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

14

States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioner's constitutional rights can be adjudicated in an appropriate manner. G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[i]t is always in the public interest to protect the violation of a party's constitutional rights"). Retaining jurisdiction over this case is essential to protecting that public interest. Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioner.

## V.    CONCLUSION

Petitioner has requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy. Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioner has satisfied his burden. He is faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful." Washington Metro. Area Transit Comm'n, 559 F.2d at 844. Certainly, the Government cannot argue that its success on the merits is a foregone conclusion. Finally, the public interest in granting Petitioner the requested relief is strong. Therefore, for the foregoing

15

reasons, Petitioner's Motion for Preliminary Injunction is **granted,**

and his Motion for Temporary Restraining Order is **denied as moot.**

An Order will issue with this Opinion.


April 4, 2005                                    ____/s/_____
                                                Gladys Kessler
                                                United States District Judge

**Copies to:**  **Attorneys of Record via ECF**

16

# EXHIBIT H

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JARALLAH AL-MARRI, et al., : | |
| Petitioners, : | |
| v. : | Civil Action No. 04-2035 (GK) |
| GEORGE W. BUSH, et al., : | |
| Respondents. : | |

<u>ORDER</u>

For the reasons stated in the Court's accompanying memorandum, docketed this same day, it is this 4th day of April, hereby

**ORDERED** that Petitioner's Motion for a Preliminary Injunction is **granted**; it is further

**ORDERED** that the Government shall provide Petitioner's counsel and the Court with 30 days' notice prior to transporting or removing Petitioner from Guantanamo Bay Naval Base; it is further

**ORDERED** that this Order shall remain in effect until the final resolution of Petitioner's habeas claim unless otherwise modified or dissolved; it is further

**ORDERED** and Petitioner's Motion for a Temporary Restraining Order is **denied as moot**.


April 4, 2005                          _____/s/_____

                                       Gladys Kessler
                                       United States District Judge


<u>Copies to</u>:  **Attorneys of Record via ECF**

# EXHIBIT J

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MURAT KURNAZ, et al. | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil No. 04-1135 (ESH) |
| | ) | |
| GEORGE W. BUSH, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| JAMEL AMEZIANE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil No. 05-0392 (ESH) |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, et al., | ) | |
| | ) | |
| Respondents | ) | |

## ORDER

Petitioners in the above-captioned cases have each requested a preliminary injunction ordering respondents to provide advance notice of petitioners' transfer from the United States Naval Base at Guantanamo Bay, Cuba, where they are currently detained. Murat Kurnaz, a twenty-two year old Turkish citizen who was born and raised in Germany, has been detained in Guantanamo Bay for more than three years. He requests thirty-days notice to counsel of any proposed transfer. Jamel Ameziane is a citizen of Algeria and has been detained for more than two years. Mr. Ameziane is as yet unaware of his representation by counsel. His counsel

-1-

requests that petitioner not be transferred from Guantanamo until counsel has had an opportunity to meet with him to ascertain his interests.

Kurnaz's case was initially consolidated before Judge Joyce Hens Green and has been stayed pending appeal to the United States Court of Appeals for the District of Columbia. *See* Order Granting in Part and Denying in Part Resp'ts' Mot. for Certification of Jan. 31, 2005 Orders and For a Stay, *In re Guantanamo Detainee Cases*, No. 02-0299, *et al.* (D.D.C. Feb. 3, 2005).[1] Since Ameziane's Petition for Writ of Habeas Corpus was filed subsequent to Judge Green's decision, it is not subject to the stay or protective orders entered by her. This Court ordered respondents to show cause by April 1, 2005 why Ameziane's writ should not be granted. (Show Cause Order, Mar. 10, 2005.) Respondents have, however, moved for a stay, which Ameziane opposes. Ameziane has also moved for entry of a protective order. The parties presented oral argument on each of these motions on April 8, 2005.

As neither Ameziane nor respondents oppose entry of protective orders identical to those entered by Judge Green, the Court does so by order below. The Court also concludes that respondents' Motion to Stay should be granted. However, to ensure that the proceedings can continue in an orderly fashion in the event that the detainees prevail on appeal, respondents are ordered to provide factual returns to Ameziane's counsel within ninety days of the date of this Order. Finally, upon consideration of the arguments of the parties, in view of the orders issued

---

[1] The stay entered by Judge Green does not bar the Court's consideration of Kurnaz's motion for injunctive relief. As noted by Judge Collyer, the stay was intended to save time, money, and judicial resources, but "could not be read to also deprive Petitioners of their rights to seek emergency assistance when faced with continued detention at the request of the United States but no venue in which to challenge its legality." *Abdah v. Bush*, 2005 WL 711814, at *4 (D.D.C. Mar. 12, 2005).

by four other judges on this Court granting substantially identical relief as is requested in this case, *see Al-Marri v. Bush*, No. 04-2035 (D.D.C. Apr. 4, 2005); *Al-Joudi v. Bush*, No. 05-0301 (D.D.C. Apr. 4, 2005); *Al-Oshan v. Bush*, No. 05-0520 (D.D.C. Mar. 31, 2005); *Al-Shiry v. Bush*, No. 04-0490 (D.D.C. Apr. 1, 2005); *Abdah v. Bush*, 2005 WL 711814 (D.D.C. Mar. 29, 2005), and for the reasons stated below, the Court concludes that petitioners must be given notice of a potential transfer in a limited type of circumstance.  In particular, if respondents have not reached a diplomatic understanding with the transferee country that a petitioner's transfer from Guantanamo is for release only, respondents must provide that petitioner's counsel with thirty days advance notice of the proposed transfer.

In *Rasul v. Bush*, 124 S. Ct. 2686 (2004), the Supreme Court held that federal courts have jurisdiction to determine the legality of the ongoing detention of petitioners held in Guantanamo Bay.  *Id.* at 2698.  *See also In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 & 479 (D.D.C. 2004) (Guantanamo detainees possess rights under the Due Process Clause and Geneva Convention); *Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152, 165 (D.D.C. 2004) (Guantanamo detainees possess rights under Geneva Convention).  Accordingly, the Court must also have authority to preserve this jurisdiction if it can be shown that respondents are acting to circumvent it.  *See* All Writs Act, 28 U.S.C. § 1651(a); *Al-Marri*, No. 04-2035, slip. op. at 10 n.11 (quoting *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996)) (All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties" of their right to sue in federal court) (internal citation omitted); *Lindstrom v. Graber*, 203 F.3d 470, 474-76 (7th Cir. 2000) (All Writs Act

-3-

permits court to stay extradition pending appeal of habeas corpus petition); *Michael v. INS*, 48

F.3d 657, 664 (2d Cir. 1995) (All Writs Act permits federal Court of Appeals to stay a

deportation order pending review of its legality). *Cf.* Fed. R. App. P. 23(a); *Jago v. U.S. Dist.*

*Court*, 570 F.2d 618, 623 (6ᵗʰ Cir. 1978) (Rule 23(a) preserves district judge's authority to issue

order regarding custody of prisoner pending review of habeas petition).

Respondents state that some petitioners may be transferred to custody of a foreign

government

> for investigation and possible prosecution and continued detention when those
> governments are willing to accept responsibility for ensuring, consistent with their
> laws, that the detainees will not continue to pose a threat to the United States and
> its allies. Such governments can include the government of a detainee's home
> country, or a country other than the detainee's home country that may have law
> enforcement or prosecution interest in the detainee.

(Waxman Decl. ¶ 3.) According to respondents, once such a transfer is effected, the Court would

lose its jurisdiction. While the Court has no occasion to decide at this time whether this or any

other type of transfer could be subject to an injunction, several examples offered by petitioners

raise sufficiently serious concerns to justify the limited remedy of advance notice. For instance, a

petitioner could be transferred to the custody of a different United States custodian in a foreign

country, such as the United States military base in Afghanistan. (*See* Kurnaz Reply at 14.)

Alternatively, he could be transferred to the custody of a foreign government, but held under the

direction and control of the United States government. *See Abu Ali*, 350 F. Supp. 2d at 69. Or,

he could be transferred to the custody of a country where he has never had occasion to violate

that country's laws, again raising a possible question as to the governmental claim of an

"independent law enforcement" interest. In such narrowly circumscribed circumstances, closer

scrutiny of the transfer might well be appropriate in order to preserve the petitioner's right to obtain review of the legality of his detention.

For these reasons, it is hereby

**ORDERED** that respondents' Motion to Stay is **GRANTED** and *Ameziane v. Bush*, No. 05-0392, is **STAYED** pending resolution of all appeals in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), and *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005). This stay shall not, however, prevent the parties from availing themselves of the procedures set forth in the Protective Order entered below, nor shall it bar the filing or disposition of any motion for emergency relief.

It is further **ORDERED** that respondents shall provide a factual return to the Court and to counsel for Ameziane within ninety (90) days of the date of this Order; and it is further

**ORDERED** that the Court **ENTERS** by way of reference the protective order and supplementary orders previously entered in *In re Guantanamo Bay Detainee Cases*, Civil No. 02-0299, *et al.*, by Judge Joyce Hens Green. These include the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November 8, 2004; the Order Addressing Designation Procedures for "Protected Information," entered on November 10, 2004; and the Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, issued on December 13, 2004.

It is further **ORDERED** that, where respondents do not have an understanding with the receiving country that a transfer from Guantanamo Bay, Cuba is for purposes of release only, respondents shall provide petitioner's counsel with thirty (30) days advance notice of the transfer,

-5-

including the proposed destination and conditions of transfer.

**ORDERED** that petitioners' motions for preliminary injunctions are **DENIED AS MOOT**.


_____
s/
ELLEN SEGAL HUVELLE
United States District Judge


Date: April 12, 2005

-6-